## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

ROBERT ARCHULETA,

      Plaintiff,

v.                                                                No. CIV 04-964 LFG

JOANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,

      Defendant.

### MEMORANDUM OPINION AND ORDER

Plaintiff Robert Archuleta ("Archuleta") invokes this Court's jurisdiction under 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security ("Commissioner"). The Commissioner determined that Archuleta was not eligible for disability insurance benefits ("DIB"). Archuleta moves this Court for an order reversing the Commissioner's final decision and remanding for a rehearing. [Doc. No. 9.]

### Background

Archuleta was born on May 26, 1960, is married and has five children, two of whom still live with him. [Tr. at 55, 56, 224.] He was 43 years old when the administrative hearing was held. [Tr. at 224.] He completed the tenth grade of high school, served in the military from 1977 until 1981, and obtained his GED in 1981. [Tr. at 55, 77, 226.] From 1984 until about 1998, Archuleta worked as a "roughneck" in oil drilling, which involved drilling for gas and handling machinery. He also worked as a bartender from 1996-1997, and as a bail bondsman from 1994-1997. Most recently,

Archuleta worked as an auto body technician, from 1998-2000, and as an auto mechanic from 2001-2002. [Tr. at 97-100.] Based on the ALJ hearing transcript, Archuleta worked for some months selling vehicles in 2003.

In mid-July 2002, Archuleta was driving a motorcycle that collided with a truck. His lower left leg was severely injured and ultimately amputated. [Tr. at 132.] After rehabilitation, Archuleta was fitted with a prosthesis below the knee, consisting of an artificial foot and tennis shoe. [Tr. at 164, 191.] In mid-August 2002, Archuleta submitted an application for DIB, claiming an onset date of July 14, 2002, due to the amputation of his lower right extremity. [Tr. at 15.] He claims he is unable to work because of "prosthetic problems." [Tr. at 9.] Archuleta stated on one disability services form that he could "not do most things [be]cause the prosthetic leg is not fitting well." [Tr. at 112.]

Administrative Law Judge ("ALJ") Gary L. Vanderhoof held an administrative hearing on January 26, 2004, in Roswell, New Mexico, at which Archuleta was represented by counsel. [Tr. at 223.] In a decision, dated April 22, 2004, Judge Vanderhoof found that Archuleta was not eligible for benefits. The ALJ specifically determined that Archuleta had the residual functional capacity ("RFC") to perform light work that required standing, walking and sitting for four hours in an eight-hour work day, and that he could perform either his past relevant work as a bail bondsman (as he performed that job) or other jobs as described by the vocational expert. [Tr. at 17-18.] On July 6, 2004, the Appeals Council denied Archuleta's request for review. [Tr. at 5.] This appeal followed.

## Standards for Determining Disability

In determining disability, the Commissioner applies a five-step sequential evaluation process.[1] The burden rests upon the claimant to prove disability throughout the first four steps of this process, and if the claimant is successful in sustaining his burden at each step, the burden then shifts to the Commissioner at step five.  If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends.[2]

Briefly, the steps are: at step one, claimant must prove she is not currently engaged in substantial gainful activity;[3] at step two, the claimant must prove his impairment is "severe" in that it "significantly limits his physical or mental ability to do basic work activities . . . .,"[4] at step three, the Commissioner must conclude the claimant is disabled if she proves that these impairments meet or are medically equivalent to one of the impairments listed at 20 C.F.R. Part 404, Subpart P, App. 1 (1999);[5] and, at step four, the claimant bears the burden of proving he is incapable of meeting the physical and mental demands of his past relevant work.[6]  If the claimant is successful at all four of the preceding steps, the burden shifts to the Commissioner to prove, at step five, that considering claimant's RFC,[7] age, education and past work experience, he is capable of performing other work.[8]

---

[1]20 C.F.R. § 404.1520(a)-(f) (1999); Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988).

[2]20 C.F.R. § 404.1520(a)-(f) (1999); Sorenson v. Bowen, 888 F.2d 706, 710 (10th Cir. 1989).

[3]20 C.F.R. § 404.1520(b) (1999).

[4]20 C.F.R. § 404.1520(c) (1999).

[5]20 C.F.R. § 404.1520(d) (1999).  If a claimant's impairment meets certain criteria, that means his impairment is "severe enough to prevent him from doing any gainful activity."  20 C.F.R. § 416.925 (1999).

[6]20 C.F.R. § 404.1520(e) (1999).

[7]One's RFC is "what you can still do despite your limitations."  20 C.F.R. § 404.1545(a).  The Commissioner has established RFC categories based on the physical demands of various types of jobs in the

If the Commissioner proves other work exists which the claimant can perform, the claimant is given the chance to prove he cannot, in fact, perform that work.[9]

**Standard of Review and Allegations of Error**

On appeal, the Court considers whether the Commissioner's final decision is supported by substantial evidence, and whether the Commissioner used the correct legal standards.  Glenn v. Shalala, 21 F.3d 983, 984 (10th Cir. 1994).  To be substantial, evidence must be relevant and sufficient for a reasonable mind to accept it as adequate to support a conclusion; it must be more than a mere scintilla, but it need not be a preponderance.  Trimiar v. Sullivan, 966 F.2d 1326, 1329 (10th Cir. 1992); Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991).  The Court's review of the Commissioner's determination is limited.  Hamilton v. Secretary of Health & Human Servs., 961 F.2d 1495, 1497 (10th Cir. 1992).  The Court's function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision and whether the correct legal standards were applied.  Id. at 1497-98.  In Clifton v. Chater, the Tenth Circuit described, for purposes of judicial review, what the record should show:

> The record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence.  Rather, in addition to discussing the evidence supporting his decision, the ALJ must discuss the uncontroverted evidence he chooses not to rely upon, as well as the significantly probative evidence he rejects.

national economy.  Those categories are: sedentary, light, medium, heavy and very heavy.  20 C.F.R. § 405.1567 (1999).

[8]20 C.F.R. § 404.1520(f) (1999).

[9]Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991).

4

Clifton v. Chater, 79 F.3d 1007, 1009-1010 (10th Cir. 1996) (internal citations omitted).  If supported by substantial evidence, the decision of the Commissioner is conclusive and must be affirmed.  The Court cannot re-weigh the evidence or substitute its judgment for that of the Commissioner.  Hargis v. Sullivan, 945 F.2d 1482, 1486 (10th Cir. 1991).

After reviewing Archuleta's few medical records, the ALJ concluded that Archuleta was not disabled under the standards of the Social Security Act.  [Tr. at 14-19.]  In reaching this decision, Judge Vanderhoof made the following findings: (1) Archuleta did not engage in substantial gainful activity since the onset of disability; (2) Archuleta's traumatic amputation of his right lower extremity is a severe impairment; (3) the impairment is not severe enough to meet or equal a Listing; (4) Archuleta's allegations of his limitations were not totally credible; (5) Archuleta retained the RFC to perform a limited range of light work; (6) Archuleta's RFC did not prevent him from performing his past relevant work of bail bondsman; (7) vocational testimony supported a finding that there were a significant number of jobs available both nationally and regionally that Archuleta could perform; and (8) Archuleta was not under a disability, as defined by the Social Security Act, at any time through the date of the ALJ's decision.  (Tr. at 17-19.)

In this appeal, Archuleta generally argues that reversal and remand are required because the ALJ's decision was not supported by substantial evidence and was contrary to the "body of law and the evidence in the record."  [Tr. at 10, p. 1.]  Specifically, Archuleta contends that his pain, amputation and subsequent limitations all reduced his RFC.  He also asserts that the ALJ provided an incomplete hypothetical to the vocational expert.  The Commissioner argues that the ALJ's decision should be affirmed because substantial evidence supports the ALJ's decision and because the decision is a correct application of the regulations.  [Doc. 11.]

## <u>Summary of Archuleta's Medical Condition and Treatment</u>

On July 14 or 15, 2002, Archuleta was involved in a motorcycle accident. The initial Emergency Room Record from Eastern New Mexico Medical Center in Roswell indicates that his lower right leg had an open fracture. The pain in his leg was severe. The record also shows a circle around "recent ETOH [alcohol]." The next page of the record also notes alcohol consumption as part of the clinical impression. [Tr. at 118-121.] Most of the medical test results were fairly normal, with the exception that there was a severely comminuted segmental fracture on Archuleta's lower leg. [Tr. at 122.]

Archuleta was airlifted to Lubbock's Covenant Health System. The discharge diagnoses were: fractured right femur, right open segmental tibial fracture; atelectasis,[10] abrasion of the trunk; crushing injury of lower leg. There appeared to be no blood flow past Archuleta's ankle on the right side, and over the next few days, it became evident that his lower right extremity was not viable and needed amputation. His lower right leg, below the knee, then was amputated. Archuleta tolerated the procedure well. [Tr. at 132.] On July 24, 2002, a medical record shows that a psychiatric consultation was sought and obtained to assess patient substance abuse, but nothing in the medical records indicates that Archuleta had a substance abuse problem.

The medical records show that Archuleta continued to improve after the amputation and that he was released with a prescription for pain medication. [Tr. at 132-33.] On July 26, 2002, Dr. Meenakshi, of the New Mexico Rehabilitation Center, performed an initial assessment on Archuleta.

---

[10]Atelectasis is an "incomplete expansion of a lung or a portion of a lung. . . ." <u>Dorland's Illustrated Medical Dictionary</u>, p. 133 (26th ed.).

Archuleta's goals then were to be free of pain, return home to live independently and "work eventually." He was unable to walk at this time. [Tr. at 144.]

A social services assessment, also dated July 26, 2002, shows that Archuleta's mental status was cheerful and that he maintained a very positive attitude. [Tr. at 148-49.] The rehabilitation discharge note, dated August 1st, 2002, documents that Archuleta was ambulating with axillary crutches, independent in all transfers and able to perform basic home tasks with crutches. He could stand for 12 minutes. Archuleta's prognosis for further improvement was good. [Tr. at 142-43.] The rehabilitation notes also record that Archuleta had a very good outlook on life. [Tr. at 146.] At the time of discharge, his pain had decreased from a 5 of 10 to a 3 of 10. [Tr. at 160.]

On August 13, 2002, Dr. Franks evaluated Archuleta for a prosthesis. [Tr. at 175, 181.] Archuleta's amputation was almost healed, and the doctor discussed the type of prosthesis Archuleta would need. [Tr. at 175.] On August 15, 2002, Archuleta applied for DIB. [Tr. at 55.] On his August 15 Disability Report, Archuleta stated he could not walk or work until he got a prosthesis. [Tr. at 71.] He also suffered from some pain at this time.

On August 16, 2002, Archuleta returned to the Rehabilitation Clinic for his first outpatient visit since his discharge. Dr. Nayak noted that Archuleta's incisions were all healed, that he walked with crutches, was independent in self care and had been seen by a prosthestist. [Tr. at 163.] Dr. Nayak commented that Archuleta would need a "stump shrinker" and would return for outpatient therapy once he was ready for prosthetic training. [Id.]

On about September 27, 2002, Archuleta received his prosthesis. [Tr. at 176.] On November 24, 2002, Archuleta filled out a work history form for his DIB application. Most recently, he had been an auto mechanic, and previously, he was a laborer at an auto body shop, a bail bondsman (and

bounty hunter at times), a security door man at a bar, a construction laborer, and a derrick hand driller. As a bail bondsman, he stated that he lifted less than 10 pounds. [Tr. at 97-100.]

On December 3, 2002, Archuleta filled out a daily activities questionnaire. He had trouble getting around his trailer house, could not carry much and could not stand too long because it was hard on his one leg. Archuleta was lifting weights to strengthen his arms. He had learned how to drive with his left foot. He used a cane, crutches and wheelchair on occasion. Archuleta had trouble getting into cars and climbing stairs. However, he was able to do some cooking for the family, along with chores like washing dishes, laundry and ironing. Archuleta's wife worked. Archuleta was able to fish and hunt, but it was difficult for him to carry a tackle box and he needed someone to help him. He read magazines and the bible, and watched television. He visited friends and family and had a lot of moral support. At first, Archuleta described having trouble sleeping due to pain but that problem had gradually gone away. He did not have much trouble dressing himself and he was not taking any medications. At this time, Archuleta was unable to walk a block without stopping. While he had a prosthesis now, he had fallen a few times. Archuleta still needed crutches, but he could take care of his personal needs. He said he had no fatigue and that he felt good. [Tr. at 87-95.]

On December 18, 2002, a doctor's note indicates that Archuleta's stump was shrinking and the socket was too big. They added some liner to the prosthesis and ordered a new fitting since the socket was too large. [Tr. at 173.]

On January 30, 2003, Dr. Don Clark, an internal medicine physician in Roswell, performed Archuleta's consultative exam. [Tr. at 164.] Archuleta reported that his greatest difficulty was with pain in the stump of his right leg and knee. He had pain in the stump and occasional phantom pain in his foot, leg and knee. Archuleta had some "bad days" when the pain was worse. He reported that

he tried to stay busy doing household chores, like vacuuming and kitchen work. He drove a car and occasionally delivered a car for a friend. Archuleta did not have trouble working the auto's accelerator pedal with his right foot. He used his left foot for braking. Archuleta was also able to drive, using a clutch, and had ridden a motorcycle two weeks ago. He had used crutches up until about 1½ to 2 months ago, but mostly did not use assistive devices unless he had a lot of pain. He had not taken pain medications since his discharge from rehabilitation. As of this date, Archuleta could walk 400 feet and did not have difficulty going up or down stairs. No depression was reported. Dr. Clark noted that Archuleta walked with a normal gait that day and was not using any assistive devices. He was using his prosthesis, i.e., artificial foot with a tennis shoe. [Tr. at 164-65.]

Dr. Clark also filled out a medical source statement of Archuleta's ability to do work-related activities. Archuleta's ability to lift and carry objects was limited to lifting 50 pounds occasionally and 25 pounds frequently. His standing and walking were also limited. While his gait was normal on that day (January 30, 2003), Archuleta stated that he used a cane when he had more pain. Dr. Clark concluded that Archuleta could stand or walk for two hours per work day and did not find any other work-related restrictions. Archuleta "wants to be active and [is] improving mobility." [Tr. at 167-68.]

On February 17, 2003, Dr. Yoder filled out a physical RFC assessment. He concluded that Archuleta could lift 20 pounds occasionally and 10 pounds frequently. Like Dr. Clark, he found that Archuleta could stand or walk two hours per day. He could sit about 6 hours. His ability to push or pull was unlimited. There were no postural or other limitations, but Dr. Yoder noted that an amputation can reasonably be expected to result in some functional limitations. [Tr. at 191-96.] Dr. Yoder believed that by July 2003, Archuleta would be capable of light work. Dr. Brady reviewed this

assessment and noted, as of June 2003, that additional medical records indicated the need for some refitting of the stump socket but no other problems.[11]   [Tr. at 198.]   However, there are no substantive medical records after the consultative exam in January 2003, and no records from July 2003 that indicate Archuleta was then capable of light work or able to stand or walk for four hours.

In early 2003, the Social Security Administration sent Archuleta a letter documenting a denial of his benefit request.  In the letter, the SSA concluded that Archuleta was not currently capable of engaging in a full range of light level work because he was unable to stand or walk for more than two hours in an eight hour work day.  Thus, Archuleta was not able to return to his past relevant work as all of it required being on his feet significantly more than two hours.  However, based on vocational rule 201.28, the SSA found that Archuleta should be able to do other work.  [Tr. at 31, 35.]

On April 15, 2003, there is a letter "to whom it may concern" from Archuleta.  He sated that he had tried to open his own small business of selling jackets and shoes on corners but found it difficult to unload boxes on his own so he closed down the business.  [Tr. at 107.]  On April 17, 2003, Archuleta requested reconsideration of the denial of his benefit request.  He stated that he was not lazy and had tried to find work.  However, he either was not hired or could not perform the work. [Tr. at 36.]

---

[11]There really are no medical records for Archuleta after Dr. Clark's consultative exam in early 2003. There are some brief notes from the Prosthetic Center indicating that Archuleta came in to have his prosthesis checked.  For example, an earlier note from December 18, 2002 indicates that the stump was shrinking and the socket was too big.  They added liner to tighten it and had ordered some "new socket fitting."  [Tr. at 173.]  On March 12, 2003, the "locking pin" was worn and replaced.  [Tr. at 172.]  On April 23, 2003, Archuleta came in for a master lock pin as the one he had was stripped out.  Archuleta replaced the pin himself.  [Tr. at 170.]  After this date, there are no medical or prosthetic records.

On June 6, 2003, the Social Security Administration denied Archuleta's request for reconsideration finding that based on Archuleta's description of his bail bond work, he could return to that job.  [Tr. at 38.]  On the written request for an ALJ hearing (dated August 20, 2003), Archuleta stated that he could not do as much as he used to do.  He had to rest because his leg needed a rest from the prosthesis.  [Tr. at 42.]

On December 25, 2003, Archuleta's disability benefit paperwork states that he was having trouble with his prosthesis.  He also had tried to do a few jobs but could not perform them.  He was not taking any medications for his problems then, although he took Tylenol for leg aches.  [Tr. at 112-115.]

On January 26, 2004, the ALJ hearing was held in Roswell.  [Tr. at 220.]  Archuleta appeared with his attorney.  He stated that his prosthesis did not fit well and that he could not sit at all.  He needed a new "leg" since the one he was using did not fit well, but he explained that a replacement would cost $5,000 and new prosthesis would cost $15,000.  [Tr. at 226-27.]  Archuleta also testified that he might need another surgery to get a screw removed from his knee because it was protruding through his knee and rubbing on the prosthesis.  He stated that he lived in constant pain but did not take any pain medications because of lack of finances.  [Tr. at 228-29.]  He rated his pain a 5 or 6 out of 10 every day.  [Tr. at 229.]  At night, his pain was an 8 out of 10.  When his pain reached a level of 10, Archuleta removed his prosthesis and took Tylenol.  [Tr. at 230.]  His pain reached a level of 10 usually in early evening when it was time to take off his prosthesis.

Archuleta said that he also had trouble with his other leg, as well as back pain.  [Tr. at 230.]  However, he testified that he used his legs on an average of 50 miles per week.  [Id.]  The following exchange between the ALJ and Archuleta occurred at the hearing.  The Court finds it difficult to

decipher what information actually is conveyed and/or whether the testimony was properly transcribed. Similarly, Archuleta's attorney's questions at the hearing provided little information as to what Archuleta was or was not capable of doing with respect to his ability to work.[12] [*See* Tr. at 13-19.]

| | |
|---|---|
| ALJ: | What problems do you have driving? |
| Archuleta: | Using this leg. This leg is just, you know, not fitting. I can drive with my left foot, but it's still not really doing the best that I can do on it. |
| ALJ: | How would you say the leg? |
| Archuleta: | I just try not to stay with this leg in the way. If you were a one-legged man, I'd understand you, you know, you could do without any problems with it. |
| ALJ: | So let us, just say that the big problem with the leg is the lower right that has you – |
| Archuleta: | Yes, sir. |
| ALJ: | But does it bother you to sit down with that? |
| Archuleta: | It just, it's a constant, it's a constant pain. It's constant. There ain't no – like I say it's just not working no more. You know, you're going to – it's not like the others around you, I just force on this one. It's all with me to – |
| ALJ: | You're saying that the nerves are – |
| Archuleta: | They ball up at the bottom of that stump. I've got the medical term for it, but they, you know. |
| ALJ: | Did – |
| Archuleta: | Something happens, you know. |

---

[12]If anything, the exchanges between Archuleta and his attorney might be read to mean that Archuleta's impairments did not prevent him from working. Most of the testimony elicited from his attorney concerned his recent work in auto sales, from October 2003 until two weeks before the ALJ hearing on January 26, 2004. Archuleta testified that he lifted 25 pounds at that job, installed devices on the steering column, sold approximately 15 cars, and washed some vehicles. He stopped working because he had rubbed a hole in his knee again, but no medical records were supplied to document these problems with the prosthesis. [Tr. at 239.]

| | |
|---|---|
| ALJ: | You're having a lot of pain, tell us? |
| Archuleta: | I can sit, but it's not good.  When my back hurts, my – this stump bothers me. It's constant.  It's constantly moving it around and when I got to move it, you know.  It's not comfortable. |
| ALJ: | And in your walking, can you walk until about 3:00, move it until about – |
| Archuleta: | That's kind of hard for me.  I'm not a, I'm not a weak man.  I try real hard to walk.  I do.  I'm not, you know.  I'm not a wimp, you know.  I really try to get out.  I know the kids are, you know, resting and I want to keep all my kids at home.  I want them to graduate from college, you know, and – so I got to go, I got to – you know, I got to show them, I didn't go.  I want them to go. You know what I mean?  I got to stand and just take this.  I got to, I just got to get off it.  There's no way I can do it.  After 5:00, I'm done, I'm done.  I'm going back to crutches again. |
| ALJ: | Let me ask you this.  Now, according to the records, or somewhere, I thought I heard in the record where you tried to get some help from DVR? |
| Archuleta: | I'm trying to get DVR to help me buy a van. |
| ALJ: | Buy a what?  What have they done for you? |
| Archuleta: | And – they sent me to talk to Dr. or Mr. Mitchell, is the one that made my first leg. |
| ALJ: | Uh-huh. |
| Archuleta: | I've got - I've had two meetings with him.  And right now, right now they, they're going to send me back to the man that originally cut my leg off. Because none, none of the orthopedic surgeons will touch me here.  They need to see if they can get that screw out or cut the point off it at least, so I can get a prosthetic made that won't bother you.  But right now I'm running until they get a prosthetic. |
| ALJ: | What – so is it your feeling or is it Social – I mean has DVR told you that they won't permit, beyond try to help us get that leg? |
| Archuleta: | They're going to pay for it if I go like stay working.  After I get, if I get me a job and I last at the job three months.  They'll pay for the leg.  They call that rehabilitate.  So, they'll pay for it.  But I've got to be able to work.  And it's – I can't work this leg or the nurses. |

13

| ALJ: | So I hear the person is – have they told you outright or do you know to whom to commit to training you, in fact. |
|---|---|
| Archuleta: | Well, but I think they have – they have legs. |
| ALJ: | Mr. Archuleta, you're still a young man.  Okay.  What, what are you going to do, to do something with the leg and – |
| Archuleta: | I want to continue working.  That's what I want to you know. |
| ALJ: | Okay. |
| Archuleta: | I don't like sitting at home.  I want to do something.  Pack up and just, just talk right now with this lady with you.  I mean – |
| ALJ: | Yeah.  Let me, sir.  If, if, if hypothetically, just if your, your application was to be approved for benefits.  Would you be willing to do whatever it takes, work with DVR, whatever agency will do. |
| Archuleta: | If it would count as disability, how about as it is, I'll do it right now.  I know that if go back to work, I'm not going to get all my benefits.  I know that, Your Honor.  But right now I need the money to help me for right now, you know.  I've worked all my life and I've paid Social Security all my life.  And if they'll work a little, I could get a little help back, you know.  Until I get back to work, you know.  It's not like I want to stay on it or whatever.  That ain't how it works.  (the transcript attributes all of these statements to the ALJ, but at least some of these statements are clearly Archuleta's testimony) |
| ALJ: | Thank you. |

[Tr. at 230-34.]

After Archuleta's attorney asked questions about Archuleta's recent work in auto sales, the ALJ presented some hypothetical questions to the vocational expert.  [Tr. at 242.]  In the hypothetical, the ALJ noted Archuleta's age, education, and the weight Archuleta could lift, along with his amputation and restrictions in climbing, stooping or balancing, etc.  The ALJ asked the VE to assume that "as [Archuleta] indicated," he could stand or walk "about half the day.  And, and sit

14

about half the day.  And by 3:00 or 5:00 he's pretty much with this type."[13]  [Tr. at 242-43.]  The VE

testified, based on the hypothetical given, that Archuleta could return to his work as a bail bondsman

and could sit four hours of the day in that job.

ALJ:    Okay.  So, the bondsman and –

VE:     I was going to say the bails – the bail bondsman, and only –

ALJ:    Bail bondsman.

VE:     — and only that part of that job [apparently meaning not the bounty hunter aspect of
        it as described by Archuleta]

.

ALJ:    Okay.  And then let me ask you this.  Would there be in addition to bailsman
        approximately with these limitations, would there be any other type work?  And if so,
        would you just cite some representative samples of jobs?

[Tr. at 243-44.]  The VE testified that there were a number of sedentary jobs that Archuleta could

perform, including cashier, procurement clerk, and machine setter or operator.

The hearing concluded with this exchange between the ALJ and Archuleta's attorney:

ALJ:        Then I've covered everything I can think of.  But if you have anything else to
            add, feel free to do so, Counsel?

Attorney:   No, Your Honor.  I think that in the, the last qualifications put down about
            not being sure enough, and working full time for whatever reason.  It might
            be nights and he couldn't do it.

ALJ:        Yeah.

Attorney:   I believe you put what I wanted.  I have no further questions.

[Tr. at 246.]

The ALJ issued a written decision denying Archuleta's benefit request.  In the body of the

opinion, Judge Vanderhoof noted Archuleta's testimony about pain and functional restrictions was

---

[13]Again, the ALJ's questions either were not properly transcribed or are unclear.

generally credible but did not support a finding of disability.  [Tr. at 16.]  In the ALJ's findings at the end of the opinion, he includes inconsistent boilerplate language that Archuleta's allegations regarding his limitations were "not totally credible for the reasons set forth in the body of the decision."  [Tr. at 18.]

Judge Vanderhoof noted Dr. Clark's opinion that Archuleta could not stand more than two hours in an eight hour work day.  [Tr. at 16-17.]  Several lines down, the ALJ states "Accordingly, I find the claimant retains the RFC to perform light work that requires standing, walking and sitting only fours (sic) hours in an eight-hour work day . . . ."  [Tr. at 17.]

### Discussion

The Court will remand this case for a re-hearing before the ALJ and for clarification.  The basis for the remand rests primarily on the Court's finding that it is unclear from the hearing transcript whether the ALJ asked sufficient questions to ascertain, as he must, "(1) the nature of a claimant's alleged impairments, (2) what on-going treatment and medication the claimant is receiving, and (3) the impact of the alleged impairment on a claimant's daily routine and activities."  Musgrave v. Sullivan, 966 F.2d 1371, 1375 (10th Cir. 1992).  On remand, the ALJ should request and obtain information as to all of these areas and ensure that a comprehensible transcript of the hearing be produced, for purposes of any future appeal.

While there is subjective evidence regarding why Archuleta may be unable to work, the Court is less certain as to what objective medical evidence exists regarding the need for possible surgery to remove a screw, the need for a new prosthesis and/or his allegations of pain.  Due to the significant expense, Archuleta sought assistance from DVR, who would pay for the new prosthesis, but apparently only if Archuleta returned to work.  Yet, he contends due to his pain and poorly fitting

16

prosthesis, he is unable to work.  Unfortunately, there are no medical or DVR records that document these problems or requests for financial help.  Neither the ALJ nor Archuleta's attorney solicited clear information at the hearing regarding whether Archuleta had received recent medical care regarding his latest problems or needed additional treatment for his impairment.  In order to better understand Archuleta's impairment and limitations, the ALJ may need to further develop the administrative record.  *See* Connick v. Barnhart, No. 04-2119, 2005 WL 1400392 (10th Cir. June 15, 2005) ("even when a claimant fails to provide pertinent information, the ALJ 'has the duty to develop the record by obtaining pertinent, available medical records which come to his attention during the course of the hearing.'")

At the rehearing, the ALJ also should address any credible allegations of pain in accordance with the framework set out in Luna v. Bowen, 834 F.2d 161 (10th Cir.1987).  This is particularly true in view of the ALJ's conclusion that Archuleta's testimony was generally credible [that he had constant pain].  The findings concerning the "generally credible" testimony seem to conflict with the ALJ's conclusion that the claimant's allegations "were not totally credible."

Parenthetically, this does not imply that the Court endorses Plaintiff's view on what is required with respect to a demonstration of disabling pain.  Plaintiff argues in the motion to reverse that a claimant need only prove that he has an "impairment that is reasonable [sic] expected to produce severe pain.  The claimant need not prove that [sic] pain is disabling or that it (impairment) will ultimately result in death."  [Plaintiff's Memorandum, at p. 2.]  Plaintiff then provides *see* references to Winfrey v. Chater, 92 F.3d 1017 (10th Cir. 1996) and Pasillas v. Shalala, 993 F. Supp. 3127 (sic) (D. Colo. 1998).  The Court does not find any discussion in Winfrey, on the page cited, for Plaintiff's proposition that the claimant need not prove the pain is disabling or that the pain need

17

not ultimately result in death.  Winfrey, 92 F.3d at 1020.  Indeed, the Tenth Circuit stated in Winfrey

that:

> [a] claimant's subjective allegation of pain is not sufficient in itself to establish
> disability.   Before the ALJ need even consider any subjective evidence of pain, the
> claimant must first prove by objective medical evidence the existence of a
> pain-producing impairment that could reasonably be expected to produce the alleged
> disabling pain."  Thompson v. Sullivan, 987 F.2d 1482, 1488 (10th Cir.1993)
> (citations omitted).  Plaintiff met this initial burden here.  X-rays of plaintiff's cervical
> spine taken in 1991 showed marked degenerative changes, and x-rays of his left
> shoulder showed degenerative changes and a narrowing of the AC joint.   A CAT
> scan of plaintiff's cervical  spine in the fall of 1991 revealed "extensive osteoarthritis
> changes of the facet joints without evidence of [a] ruptured disk," Tr. at 206, and
> x-rays of plaintiff's lumbosacral spine showed "moderate lipping of osteoarthritis," but
> "no degenerative changes," id. at 213.  The ALJ was then required to consider all the
> relevant objective and subjective evidence and "decide whether he believe[d] the
> claimant's assertions of severe pain," Luna v. Bowen, 834 F.2d 161, 163 (10th
> Cir.1987).   The ALJ found that plaintiff's subjective complaints of pain were not
> credible to the extent they suggested he could not perform a full range of medium
> work.   "Findings as to credibility should be closely and affirmatively linked to
> substantial evidence...."  Huston v. Bowen, 838 F.2d 1125, 1133 (10th Cir.1988).

Id.

The Court also examined Plaintiff's other case citation to Pasillas, 993 F. Supp. at 1334, and

again finds no support on the page cited for Plaintiff's stated proposition.  Nothing in either of these

cases discusses pain in the context of death, for example.  Neither case states that the applicant need

not prove pain to be disabling.

The Court essentially agrees with the Commissioner that there is little or no medical evidence

in the record to support an allegation of disabling pain.  And, as stated above, the "[c]laimant's

testimony alone cannot establish the existence of disabling pain."  Musgrave, 966 F.2d at 1376.

However, the Court is troubled by the ALJ's determination in the body of his decision that Archuleta

was generally credible regarding his pain and his functional limitations , and the ALJ's later expressed

18

finding in the opinion that Archuleta's testimony about his limitations was not totally credible for the reasons set out in the body of the decision.

In addition, the Court is concerned about the lack of any current (as of the date of the ALJ's decision) objective medical evidence regarding Archuleta's possible pain due to the alleged problem with his prosthesis and the lack of subsequent medical information regarding the February 2003 prognosis that Archuleta would be capable of light work as of July 2003.  There are no helpful medical records after February 2003, and the Court is, therefore, unable to determine whether Archuleta actually was capable of light work as of July 2003, or even later at the time of the ALJ's decision.  Thus, the ALJ may need to assess whether a consultative exam or additional medical records should be obtained.

Finally, and perhaps most importantly (although not raised by Plaintiff's counsel), the Court requests clarification regarding the ALJ's conclusion that Archuleta was able to stand or walk for four hours in an eight-hour work day.  Dr. Clark, the consultative physician, determined as of January 2003, that Archuleta could not stand or walk for more than two hours per day.  On February 17, 2003, as to Archuleta's ability to stand or walk, Dr. Yoder checked the box: "at least 2 hours in an 8-hour workday."  Dr. Yoder also stated that "the claimant's amputation can reasonably be expected to result in some functional limitations."  [Tr. at 196.]  These medical records, therefore, are at odds with the ALJ's conclusion.

The ALJ's decision notes that Archuleta could stand or walk at least four hours a day based on Archuleta's testimony at the hearing.  However, Archuleta's hearing testimony was far from clear. He stated that when his leg hurt, he stayed off of it.  "It's – you know, even when I – even on a good day, I'm good until about 3:00.  And then I got to go in and take it off and just – I feel too much pain

19

from the way it fits me." [Tr. at 229.]  The ALJ did not ask Archuleta what time he arose in the morning and/or started working, or how much of the day Archuleta stood or walked before 3:00 p.m. Thus, the Court asks that the ALJ clarify on remand what substantial evidence he relied on to support the conclusion that Archuleta could stand or walk at least four hours during a work day.

IT IS THEREFORE ORDERED that Archuleta's Motion to Reverse and Remand for a Rehearing [Doc. No. 9] is GRANTED and that this matter is remanded for a rehearing so that the ALJ can address the issues described herein.


_Lorenzo F. Garcia_
Lorenzo F. Garcia
Chief United States Magistrate Judge